2007 WY 36

SPEIGHT, McCUE & ASSOCIATES, P.C., Appellant (Respondent),

v.

French Carter WALLOP and Scott M. Goodwyn, Appellees (Petitioners).

French Carter Wallop and Scott M. Goodwyn, Appellants (Petitioners),

v.

Wyoming State Bar Committee on Resolution of Fee Disputes; and Speight, McCue & Associates, P.C., Appellees (Respondents).

Nos. 06–142, 06–143.

Supreme Court of Wyoming.

March 5, 2007.

Representing Speight, McCue & Associates, P.C.: William M. McKellar of Boley & McKellar, P.C., Cheyenne, Wyoming.

Representing French Carter Wallop and Scott M. Goodwyn: Daniel B. Frank of Frank Law Office, P.C., Cheyenne, Wyoming.

Before VOIGT, C.J., and DONNELL, BROOKS, PARK and JAMES, D.JJ.

DONNELL, District Judge.

[¶ 1]   This matter concerns the application of certain payments to a guaranty agreement.   The Committee for Resolution of Fee Disputes held that payments made for legal fees were personal loans between the debtor and the guarantor and, thus, did not satisfy the guarantor's obligations under his Guaranty Agreement with the law firm.   The District Court ruled to the contrary with respect to all payments that occurred after the effective date of the agreement.   We affirm the decision of the District Court.

## ISSUE

[¶ 2]   As to the initial appeal, Speight, McCue & Associates, P.C. (SMA)[1] posits the following issue for review:

Did Petitioner Goodwyn's loans to his mother, French Wallop, to assist her in paying the Law Firm for her divorce legal bills discharge Goodwyn's obligations under a guaranty agreement between Goodwyn and the Law Firm guaranteeing the payment of those legal bills?

[¶ 3]   Wallop and Goodwyn frame the issue somewhat differently:

Did Scott Goodwyn's payment of over $100,000 to French Wallop's attorneys discharge his obligations under the Guaranty Agreement where the Guaranty Agree-

ment specifically required "prompt payment when due" of all debts of French Wallop and where the Guaranty Agreement specifically limited Goodwyn's liability to $100,000?

[¶ 4]   As to the cross-appeal, Goodwyn and Wallop present the following issue on appeal:

Did the district court err when it determined that Scott Goodwyn's payment of $10,000 on the day before he executed the Guaranty Agreement should not apply toward his obligations under the Guaranty Agreement?

[¶ 5]   Succinctly summarized, the issue before this Court is whether the District Court correctly applied certain of Goodwyn's payments to SMA against Goodwyn's obligation under a guaranty agreement.

## FACTS

### I.   Substantive Facts

[¶ 6]   Pursuant to an engagement letter dated October 9, 2000 (and executed on October 10, 2000), French Carter Wallop (Wallop) hired SMA's predecessor firm to represent her in a divorce action.   At the time the parties entered into their agreement, SMA contemplated that Wallop's legal fees would total $100,000 to $150,000.

[¶ 7]   On October 11, 2000, SMA received a $10,000 payment from Wallop's son, Scott Goodwyn (Goodwyn), toward an agreed-upon $15,000 retainer fee.   On October 12, 2000, SMA sent correspondence to Wallop as an addendum to the October 9, 2000 engagement agreement.   This addendum required Wallop's signature and referenced a Guaranty Agreement to be executed by Goodwyn. SMA indicated that, once the October 12, 2000 addendum and the Guaranty Agreement were signed, SMA would enter an appearance on Wallop's behalf.

[¶ 8]   On October 13, 2000, Goodwyn executed a Guaranty Agreement for the purpose of guaranteeing the payment of Wallop's le-

---

1.   SMA's predecessor firm was Hathaway, Speight & Kunz, LLC.   For ease, the Court will refer to the law firm as SMA.

gal bills up to $100,000.[2] The Guaranty Agreement provided, in relevant part:

## I. OBLIGATIONS

This Guaranty is given by the Guarantor to induce the Creditor to perform legal services and advance legal fees and costs for the Debtor, and in consideration of the Creditor doing so, ... the Guarantor **absolutely and unconditionally** guarantees prompt payment when due of all payments and liabilities of the Debtor to the Creditor, whether now existing or hereafter incurred (it being understood and agreed that this Guaranty is a continuing one, except as such duration is specifically limited elsewhere in this Guaranty), whether voluntary or involuntary and however arising, whether secured or unsecured, absolute or contingent, liquidated or unliquidated, and regardless of whether the Debtor may be liable individually or jointly with others, regardless of whether recovery upon any such obligation may be or hereafter become barred or otherwise unenforceable, including interest and charges, and to the extent not prohibited by law, all costs and attorneys' fees incurred in attempting to realize upon this Guaranty.

## II. LIMITATION OF AMOUNT

The liability of the Guarantor pursuant to this Guaranty (exclusive of any costs and expenses incurred by the Creditor to realize upon this Guaranty) shall not, at any time, exceed the sum of One Hundred Thousand Dollars ($100,000.00).

## III. DURATION

This is a continuing Guaranty and shall not be revoked by the Guarantor. This guaranty will remain effective until all obligations guaranteed by this Guaranty are completely discharged.

## IV. NOTICE OF DEFAULT

The Creditor shall not be required to notify the Guarantor of a default by the Debtor in the Debtor's commitments to the Creditor before proceeding against the Guarantor under this Guaranty.

## V. CREDITOR PROVISIONS

... The Guarantor waives presentment, protest, notice, demand, or action on delinquency in respect of any such indebtedness or liability, including any right to require the Creditor to sue or otherwise enforce payment thereof. ...

(Emphasis added.)

[¶ 9] Over the next twenty-two months, Goodwyn made the following payments to SMA:

| Date | Payment | Form of Payment | Notations on Document |
|------|---------|-----------------|------------------------|
| October 11, 2000 | $ 10,000 | Wire transfer | N/A |
| October 31, 2000 | $ 5,000 | Check #201 | "balance of retained fee" |
| November 15, 2000 | $ 13,226 | Check #229 | "divorce legal fees" |
| July 30, 2001 | $ 50,000 | Wire transfer | N/A |
| August 21, 2002 | $ 25,000 | Check #281 | "payment on divorce legal fees" |
| **TOTAL** | **$103,226[3]** | | |

[¶ 10] Goodwyn testified that all payments were specifically made as payments for Wallop's legal bills and pursuant to his agreement with SMA. As between themselves, Wallop and Goodwyn agree that Wallop was to repay these funds to Goodwyn.[4]

---

2. The Guaranty Agreement was "effective as of October 12, 2000[.]" Under the agreement, Goodwyn was the guarantor; Wallop was the debtor; and SMA was the creditor.

3. In addition to these payments to SMA, Goodwyn paid $3,895.71 directly to the court reporter for Wallop's trial transcripts.

4. Further, in Wallop's subsequent bankruptcy filings, she lists Goodwyn as an unsecured creditor for a personal loan of $250,000. Goodwyn filed

[¶ 11] After the divorce action was complete, Wallop had not paid all of the attorneys' fees and costs that had been billed to her, and SMA made specific demand upon Goodwyn under the Guaranty Agreement. Goodwyn contended that he already fulfilled that obligation through his payments of $103,226 to SMA.

## II. Procedural History

[¶ 12] This appeal comes to this Court by way of a Petition for Resolution of Fee Dispute that Wallop and Goodwyn filed with the Wyoming State Bar on January 3, 2003. Ultimately, the Committee on Resolution of Fee Disputes (the Committee) considered several issues, including the issue of whether $103,226 paid by Goodwyn to SMA for Wallop's legal bills fulfilled Goodwyn's obligations under the Guaranty Agreement. As its decision relates to this appeal, the Committee concluded that the $103,226 paid by Goodwyn was made as a loan to Wallop to assist her in paying her legal fees and not as payments under the Guaranty Agreement. The Committee concluded that Goodwyn remained obligated for the full amount of the Guaranty Agreement.

[¶ 13] Thereafter, Goodwyn petitioned the District Court for review of the Committee's decision. The District Court heard additional evidence and reversed the Committee's decision. Both parties appealed. In *Speight, McCue & Assocs., P.C. v. Wallop*, 2005 WY 75, 115 P.3d 39 (Wyo.2005), this Court reversed and remanded the matter with instructions to the District Court to remand the matter to the Committee for the purpose of taking additional evidence.

[¶ 14] On remand, the Committee held a subsequent hearing, at which it took additional evidence. However, the Committee's ultimate conclusions remained the same.

[¶ 15] Goodwyn again petitioned for review of the Committee's decision. On May 9, 2006, the District Court entered its Order After Appeal of Second Committee Decision, effectively reversing the Committee's deci-

sion. The District Court would not allow Goodwyn a credit for the $10,000 payment made by Goodwyn to SMA prior to the October 12, 2000 date of the Guaranty Agreement. However, the subsequent $93,226 in payments was determined to have been made in satisfaction of Goodwyn's obligation under the Guaranty Agreement. Accordingly, the District Court held that Goodwyn owed an additional $6,774 under the Guaranty Agreement.

[¶ 16] On June 5, 2006, SMA filed its notice of appeal. Thereafter, Goodwyn and Wallop filed their cross-appeal.

## STANDARD OF REVIEW

[¶ 17] This Court has previously considered the standard of review that applies to the appeal of a decision by the Committee on Resolution of Fee Disputes. This Court concluded:

> Judicial review of the fee dispute committee's decision, however, will be conducted in accordance with Fee Dispute Rule 14 by employing standards provided in W.R.A.P. 12. This interpretation of the fee dispute rules allows the rule which specifically addresses judicial review (Fee Dispute Rule 14) to control over the rule which addresses the fee dispute process in general (Fee Dispute Rule 9). Moreover, our decision gives effect to the language in Fee Dispute Rule 14(d) which directs the appellate court to "review the record" of the fee dispute committee hearing. Treating the fee dispute committee as an administrative agency for the purposes of appeal recognizes the importance of the fee dispute committee's function in resolving the factual issues involved in fee disputes. By applying our standard of review for administrative decisions, we give deference to the fee dispute committee's findings of fact, while affording the parties the right to judicial review of the fee dispute committee's decision to ensure substantial evidence supports those factual findings. *See e.g., KG Construction, Inc. [v. Sherman,*

a claim against Wallop's bankruptcy estate for $356,618.37 for loans made between 1995 and 2004. Of this amount, $249,409.37 represented other itemized loans and $107,209.00 represent-

ed expenses Goodwyn paid on the Wallop divorce case. Goodwyn included, with his claim, copies of the wire transfer receipts and checks for payments made to SMA.

2005 WY 116], ¶ 9, 120 P.3d [145,] 147 [(Wyo.2005)]; *Newman v. State ex rel. Wyo. Workers' Safety and Comp. Div.*, 2002 WY 91, ¶ 12, 49 P.3d 163, 168 (Wyo. 2002).

**Thus, we will scrutinize the fee dispute committee's decision in this case in accordance with the procedures for judicial review of administrative decisions as set forth in W.R.A.P. 12.01** *et. seq.* **and § 16–3–114(c).**[5] As we have discussed on innumerable occasions:

The substantial evidence test is the appropriate standard of review in appeals from contested case proceedings when factual findings are involved and both parties submit evidence. *Robbins v. State ex rel. Wyo. Worker's Safety & Comp. Div.*, 2003 WY 29, ¶ 18, 64 P.3d 729, 732 (Wyo.2003). Substantial evidence is relevant evidence which a reasonable mind might accept in support of the agency's conclusions. It is more than a scintilla of evidence. Even if the factual findings are found to be supported by substantial evidence, the ultimate agency decision may still be found to be arbitrary or capricious for other reasons. An appellate court does not examine the record only to determine if there is substantial evidence to support the agency's decision, but it also must examine the conflicting evidence to determine if the hearing examiner could have reasonably made its finding and order upon all of the evidence before it. *Newman v. State ex rel. Wyo. Workers' Safety and Comp. Div.*, 2002 WY 91, 49 P.3d 163, 172 (Wyo.2002).

*KG Construction, Inc.*, ¶ 9, 120 P.3d at 147. The fee dispute committee's conclusions of law, however, are not entitled to

5. Section 16–3–114(c) of the Wyoming Administrative Procedure Act states, in pertinent part:
(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

the same deference as its factual findings. We review the fee dispute committee's conclusions of law *de novo*. *DC Production Service v. Dep't of Employment*, 2002 WY 142, ¶ 7, 54 P.3d 768, 771 (Wyo.2002).

*Cotton v. McCulloh*, 2005 WY 159, ¶¶ 18–19, 125 P.3d 252, 259–60 (Wyo.2005) (emphasis added).

## DISCUSSION

[¶ 18] Although this case returns with a complex procedural history, the heart of the matter is relatively straightforward: Whether $103,226 in payments that Goodwyn made to SMA for Wallop's legal fees should be credited against his obligation under the Guaranty Agreement in light of the fact that these payments also were determined to have been personal loans between Wallop and Goodwyn.

[¶ 19] The Committee based its decision that Goodwyn was not entitled to a credit or offset of $103,226 on the evidence that the payments were a "loan" from Goodwyn to Wallop that Wallop was expected to repay. The District Court disagreed, allowing the offset for all monies paid after the October 12, 2000 effective date of the Guaranty Agreement. This Court agrees with the District Court.

## I. The Plain Language of the Guaranty Agreement

[¶ 20] Wyoming law strictly limits a guaranty agreement to its terms. A guarantor's liability "cannot be extended by construction or by implication beyond the express terms of the guaranty." *Sec. State Bank of Basin v. Newton*, 707 P.2d 173, 175 (Wyo.1985). *See also Flying J, Inc. v. Booth,*

. . . .
(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:
(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

. . . .
(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.
Wyo. Stat. Ann. § 16–3–114(c) (LexisNexis 2005).

773 P.2d 144, 149 (Wyo.1989). Accordingly, this Court turns its attention to the language of the Guaranty Agreement.

[¶ 21] Pursuant to the agreement, Goodwyn absolutely and unconditionally guaranteed prompt payment of Wallop's legal fees, whenever they came due, up to a total obligation of $100,000. SMA had no obligation to notify Goodwyn of Wallop's default before proceeding under the guaranty. Further, Goodwyn waived "presentment, protest, notice, demand, or action on delinquency in respect of any such indebtedness or liability[.]"

[¶ 22] Goodwyn promptly made periodic payments to SMA in order to satisfy Wallop's accrued legal fees. He was paying these legal fees with his own money, not commingled or joint funds. Quite simply, no other reason existed for the payment of these fees than Goodwyn's obligation under the Guaranty Agreement. This conclusion complements the District Court's conclusion that "the only reasonable inference regarding payments by [Goodwyn] to SMA after October 12, 2004[sic] is that the payments were made pursuant to the [Guaranty Agreement]." Goodwyn's acts comport with the plain and unambiguous language of the Guaranty Agreement that reflected the parties' intent and Goodwyn's obligation to "promptly pay."

### A. Guarantor versus Surety

[¶ 23] SMA argues that the District Court confused the roles of a guarantor and a surety by making Wallop's and Goodwyn's obligations coextensive. Of course, while a surety "becomes bound as the principal or original debtor is bound," a guarantor "is not bound to do what the principal has contracted to do ... but only to answer for the consequences of the default of the principal." *State Bank of Burleigh County v. Porter*, 167 N.W.2d 527, 533 (N.D.1969). Accordingly, SMA argues, by paying the legal bills before Wallop had the opportunity to default on her obligations, Goodwyn was not acting in his role as a guarantor but was,

instead, simply making payments on Wallop's behalf.

[¶ 24] The flaw with this argument is that the Guaranty Agreement unambiguously required Goodwyn to make *prompt* payment of attorney's fees when due. Further, it did not require demand on Wallop; notice of Wallop's default;[6] or SMA's specific demand of payment from Goodwyn before any payments were considered guaranty payments. Any assertion that Wallop must have been given the opportunity to default is disingenuous for the simple reason that the Guaranty Agreement specifically stated otherwise.

### B. Continuing Nature of the Guaranty

[¶ 25] The parties also make much of the "continuing nature" of the guaranty. However, both concede that, even a continuing guaranty may be limited as to the amount guaranteed. *See* 38 Am.Jur.2d *Guaranty* § 22 (1999). Such was the case here. Accordingly, the Court need not consider this argument further.

### C. Effective Date of the Guaranty Agreement

[¶ 26] The Guaranty Agreement clearly references an effective date of October 12, 2000. Goodwyn's first payment of $10,000 occurred on October 11, 2000. The parties were free to mention this initial $10,000 payment in their subsequently executed Guaranty Agreement and to credit it against Goodwyn's obligation. They did not. Goodwyn simply was not obligated to pay an amount that was not expressly guaranteed. *See Sec. State Bank of Basin*, 707 P.2d at 175.

[¶ 27] This Court has no alternative but to construe the agreement to mean exactly what it says. Goodwyn's October 11, 2000 payment did not fall under the terms of the Guaranty Agreement because it was made prior to the effective date thereof. As a result, Goodwyn is entitled to credit for $93,226 in payments made pursuant to his obligations under the Guaranty Agreement.

---

**6.** Because the guaranty was "absolute and unconditional", by its very terms, the "rule is that no demand on the principal debtor is necessary to render the guarantor liable in case of such a guaranty[.]" 38A C.J.S. *Guaranty* § 73 (1996).

His other payment of $10,000 falls outside the agreement's terms.

## II. Dual Role as Personal Loans and Guaranty Payments

[¶ 28] SMA argues, and the Committee concluded, that, by characterizing Goodwyn's payments to SMA as "personal loans," those monies forfeited their status as guaranty payments. Neither party presented any law that supported this conclusion. Indeed, guarantors often expect recoupment and reimbursement of funds they have paid pursuant to a guaranty. *See* 38 Am.Jur.2d *Guaranty* § 120 (1999). And, even a voluntary payment by a guarantor entitles him to proceed against the principal debtor. *See Fabian v. Dykes*, 214 Ga.App. 792, 449 S.E.2d 305, 306 (1994), *overruled in part, on other grounds, by Continental Ins. Co. v. State Farm Mut. Ins. Co.*, 212 Ga.App. 839, 443 S.E.2d 509 (1994). One court has summarized the relationship as follows:

> Where a guarantor pays the debt of the principal debtor the law implies a promise of reimbursement, and the action is based upon equitable principles. *In re Jamison's Estate*, 202 S.W.2d 879, 883 (Mo. 1947). The recovery by the guarantor is based on the doctrine of equity against unjust enrichment, and not on contractual relationship. It does not need the consent of the principal, but equity enforces the right to reimbursement by subrogation. *Id.* Thus, a guarantor who pays the debt or judgment of another, "at least as against the debtor primarily liable, [is] subrogated to all the rights and remedies of the creditor, *and this even without formal assignment of the debt or judgment.*" [emphasis added]. *Phelps v. Scott*, 325 Mo. 711, 30 S.W.2d 71, 75 (1930); *First State Bank v. Reorganized School Dist. R–3 Bunker*, 495 S.W.2d 471, 484–85 (Mo.App.1973).

*Gibson v. Harl*, 857 S.W.2d 260, 268 (Mo.Ct. App.1993).

---

7. It would not be unusual for a guarantor to expect "repayment" of any guaranty monies by a debtor. The difference being that, generally, the creditor would never know about this "side deal" between the guarantor and the debtor. The Court is reminded of an analogy in which a college student buys a car, with his parent serving as a guarantor. If the student defaults, the parent pays the obligation. It generally would be expected, one dares to say, that the student would repay the parent when possible. This expectation does not result in a negation of the fact that the parent satisfied his guarantor's obligation.

[¶ 29] The mere fact that Goodwyn's payments to SMA also might be characterized as personal loans to Wallop does not negate their status as guaranty payments.[7]

## CONCLUSION

[¶ 30] Goodwyn is entitled to credit against his obligations under the Guaranty Agreement in the amount of $93,226. The District Court's Order After Appeal of Second Committee Decision is affirmed in its entirety.